**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MARTIN K. EBY CONSTRUCTION
CO., INC.
　　　　　　　　Plaintiff,

vs.　　　　　　　　　　　　　　　　Case No. 3:05-cv-394-J-32TEM

JACOBS CIVIL, INC., etc., et al.,

　　　　　　　　Defendants.

_____

**ORDER**[1]

　　　Before the Court are Defendants' motions to dismiss the First Amended

Complaint in which a highway contractor seeks damages from the project owner's

design and engineering consultants arising out of a highway construction project

known as the Wonderwood Connector - Contract 2, located in Jacksonville, Florida.

(Eby III, Doc. 16.)[2]   The Court has considered the motions to dismiss filed by

defendants Jacobs Civil, Inc. ("Jacobs") and  Theodore A. Finch ("Finch") (together

_____

[1]　　Under the E-Government Act of 2002, this is a written opinion and therefore
is available electronically.  However, it is intended to decide the motion addressed
herein and is not intended for official publication or to serve as precedent.

[2]　　As discussed, infra, this matter is the third of three cases filed by Martin K.
Eby Construction Co. all arising out of the same road and bridge construction
project.  In attempt to avoid confusion, cites to the Record in this case will be
labeled as: "(Eby III, Doc. __)".

referred to as "Jacobs")   (Eby III, Doc. 20), and by defendants Reynolds, Smith and Hills, Inc. ("RS&H") and Reynolds, Smith and Hills CS, Inc. ("RSHCS") (Eby III, Doc. 22-1), as well as Plaintiff Martin K. Eby Construction Co.'s ("Eby") responses thereto. (Eby III, Docs. 26, 27.)   Additionally, the Court considered argument of counsel presented at a hearing held on June 9, 2006.  The Court concludes, for the following reasons, that these motions to dismiss should be granted with prejudice, on the basis of *res judicata*, and alternatively, collateral estoppel.

## I.    **Standard**

When considering a motion to dismiss under Federal Rules of Civil Procedure Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true, consider the allegations in the light most favorable to the plaintiff, and accept all reasonable inferences that can be drawn from such allegations.  Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003); Jackson v. Okaloosa County, Fla., 21 F.3d 1531, 1534 (11th Cir. 1994).  A complaint may not be dismissed under Rule 12(b)(6) "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Lopez v. First Union Nat'l Bank, 129 F.3d 1186, 1189 (11th Cir. 1997)(quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

On motion to dismiss, the Court limits its considerations to the pleadings and exhibits attached thereto.  GSW, Inc. v. Long County, Ga., 999 F.2d 1508, 1510 (11th Cir. 1993).  When the motion is based on failure to state a claim, the district court

2

must either limit itself to the allegations within the complaint or, at its discretion, treat the motion as one for summary judgment and provide adequate notice as required by Rule 56(c).  Jones v. Automobile Ins. Co., 917 F.2d 1528, 1531-32 (11th Cir. 1990).

The Eleventh Circuit has held that when considering a Rule 12(b)(6) motion to dismiss, a court may take judicial notice of the public record, without converting the motion to dismiss to a motion for summary judgment.  This is because such documents are capable of accurate and ready determination.  Makro Capital of America, Inc. v. UBS AG, 372 F. Supp.2d 623, 627 (S.D. Fla. 2005)(citing Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1279-80 (11th Cir. 1999)); Broward Garden Tenants Ass'n. v. E.P.A., 157 F.Supp.2d 1329, 1335 n. 8 (S. D. Fla. 2001).  See also Universal Express, Inc. v. SEC, No. 05-13142, 2006 WL 1004381, at * 1-2 (11th Cir. 2006).  Thus, the Court may take judicial notice of documents filed in other judicial proceedings, because they are public documents, without converting the motions to dismiss filed herein to motions for summary judgment, see Universial Express, 2006 WL 1004381, at * 2, for the limited purpose of recognizing the "judicial act" taken, or the subject matter of the litigation and issues decided (as opposed to adopting the findings of fact made therein).  Young v. City of Augusta, Ga., 59 F.3d 1160, 1166 n.11 (11th Cir. 1995); In re Delta Resources, Inc., 54 F.3d 722, 725 (11th Cir. 1995); United States v. Jones, 29 F.3d 1549, 1553 (11th Cir. 1994).  See also Keinz v. Crosby, No. 05-12162, 2006 WL 408686, at *1 n.2 (11th Cir. 2006).  Furthermore, the

3

Court may consider the record in previous cases to clarify the meaning of the court orders.  Wagner v. Daewood Heavy Industries America Corp., 289 F.3d 1268, 1274 n.7 (11th Cir.), vacated on different grounds, 298 F.3d 1228, 314 F.3d 541 (11th Cir. 2002).  See generally Schafler v. Indian Spring Maintenance Ass'n., 139 Fed. Appx. 147, 149 (11th Cir. 2005)(court took judicial notice of orders issued in previous lawsuits finding requirements of *res judicata* met and dismissing complaint).

Accordingly, the Court takes judicial notice of the following two cases and their records, both of which involve the same project, and both at varying stages of litigation before this Court:  Martin K. Eby Construction Co., Inc. v. Jacksonville Transportation Authority, Case No. 3:03-cv-41-J-32TEM ("Eby I"), and Martin K. Eby Construction Co., Inc. v. Jacksonville Transportation Authority, Case No. 3:04-cv-1234-J-32MCR  ("Eby II").[3]

## II.   Background

### A.   The Project

The subject matter of all three lawsuits is the Wonderwood Project - Contract 2 ("Wonderwood 2 Project" or "Project"), a 2.1 mile highway which formed a part of the Wonderwood Connector in Jacksonville, Florida.  The Wonderwood 2 stretch of roadway involving Eby travels over marshland, a creek called Greenfield Creek, and

---

[3]    The Court grants RS&H and RSHCS' pending Motion for Judicial Notice. (Doc. 36.)

the Intracoastal Waterway and Pablo Creek.  The Project was "owned" by the Jacksonville Transportation Authority ("JTA").  (Eby III, Doc. 16,  ¶ 8; see Eby I, Doc. 24, ¶ 9; Doc. 167 at 3-4.)  Eby submitted the low bid for the Wonderwood 2 Project (Eby III, Doc. 16, ¶¶ 17, 26, 46), and JTA awarded the contract to construct the Wonderwood 2 Project to Eby for the fixed price of $36,887,852.12. (Eby III, Doc. 16, ¶ 54; Eby I, Doc. 167 at 39.)

As alleged by Eby in its First Amended Complaint (Eby III, Doc. 16), defendant Jacobs[4] "was the engineering firm retained by JTA and responsible for the preparation of the construction documents and the design of the Project."  Mr. Finch, who was employed by Jacobs, and later by RS&H, was the Engineer of Record for the Project. Jacobs and Finch prepared the permit drawings and the construction documents, including the plans and specifications, for the Project.  (Eby III, Doc. 16, ¶ 9.)

RS&H "was the general engineering consultant retained by JTA in connection with the Project. RS&H was required to provide design review of the plans and specifications, perform constructability analyses, review the estimate of construction costs, compile the contract documents, determine the order of priority in the event of conflict between disparate contract documents, and perform various administrative services." (Eby III, Doc. 16, ¶ 10.)

---

[4]   Jacobs was formerly known as J. E. Sverdrup, Inc. and Sverdrup Civil, Inc. (Eby III, Doc. 16, ¶ 2.)

RSHCS was a "subconsultant to RS&H" that "assumed all the obligations of RS&H in connection with the Project and also provided the construction administration services for the Project," including "review and approval of proposals from Eby concerning the temporary structures, interpreting the contract documents, monitoring and documenting 'force account' work, processing and making recommendations or decisions on matters submitted by Eby, such as requests for equitable adjustment and claims, and administering and monitoring the construction of the Project." (Eby III,  Doc. 16, ¶ 11.)

The Court now reviews the public records of the Eby I and Eby II cases for purposes of determining the subject matter of each case and the issues decided.

**B.   Martin K. Eby Construction Co., Inc. v. Jacksonville Transportation Authority, Case No. 3:03-cv-41-J-32TEM  ("Eby I")**

**1.   Eby's Complaint**

Based upon diversity jurisdiction, Eby filed a lawsuit in this Court against JTA on January 21, 2003, seeking recovery for losses it had sustained to date in the Wonderwood 2 Project, which was still under construction at the time.  Eby updated its allegations on November 18, 2003, filing a First Amended and Supplemental Complaint.  (Eby I, Docs. 1, 24.)  The undersigned tried the case.

Eby's allegations in Eby I began with the JTA's request for bids on January 8, 2001, requiring bids to be submitted forty-four (44) days later on February 21, 2001.  (Eby I, Doc. 24, ¶ 9.)  Eby submitted the low bid in the amount of $36,887,852.12

6

(<u>Eby I</u>, Doc. 24, ¶ 10), and was awarded the construction contract.

The amended complaint recounts problems encountered by Eby with the construction of temporary access roads and "fingers" (temporary structures) required for access and use as working platforms for equipment necessary to the construction of the two bridges.  (<u>Eby I</u>, Doc. 24, ¶¶ 11, 17-26, 33.)  Eby cited to pre-bid plans, drawings and specifications in the contract documents concerning the temporary structures.  (<u>Eby I</u>, Doc. 24, ¶¶ 12, 14, 15, 16.)

Eby alleged that "[a]fter award of the contract, and as part of initial performance, Eby attempted to construct temporary structures of the type shown by the contract documents.  However, Eby determined the temporary structures shown [on JTA drawings] could not be constructed because the subsoil was not capable of supporting the necessary loads."  (<u>Eby I</u>, Doc. 24, ¶ 17.)  Eby alleged it encountered soil conditions very different from "conditions as represented at the pre-bid meeting", and that the temporary structures were settling up to six feet deep.  (<u>Id</u>.)

Eby's amended complaint in <u>Eby I</u> recounts how JTA and Eby attempted to work through the soft soil and temporary structure constructability issues, and Eby's request for an equitable adjustment from JTA of $2,162,027 for the soft soil modifications, and a second equitable adjustment of $7,727,702 plus additional time for difficulties encountered at the Pablo Creek crossing.  (<u>Eby I</u>, Doc. 24, ¶¶ 18-26.)

Eby asserted four claims against the JTA: Count I for "Differing Site

7

Conditions," based upon a contract clause for differing site conditions allowing for an equitable adjustment to Eby, and based upon Eby allegedly "encounter[ing] subsurface physical conditions which differed materially from those *indicated* in the contract" (Eby I, Doc. 24, ¶¶30-34 (italics in original)); Count II for "Breach of Contract" based upon JTA's refusal to pay the requested equitable adjustments and to extend the contract time (Eby I, Doc. 24, ¶¶ 35-38); Count III for "Superior Knowledge" alleging that JTA had superior knowledge about subsoil conditions that were not communicated to Eby  (Eby I, Doc. 24, ¶¶ 39-41); and Count IV entitled "Constructability" alleging that JTA "breached its implied warranty of plans and specifications" and is thus indebted to Eby in the amount of the requested equitable adjustments.  (Eby I, Doc. 24, ¶¶ 42-45.)

Eby also alleged that it had encountered a serious problem with the main span over the Intracoastal Waterway, and reserved the right to bring an additional claim concerning the beam deflection on the main span.  (Eby I, Doc. 24, ¶ 8.)

## **2.    The Court's Findings of Fact and Conclusions of Law**[5]

The Court conducted a nine day bench trial in December 2004 (Eby I, Docs. 115-18, 121-22, 124, 126, 132) on Eby's claims.  (Eby I,  Doc. 167 at 1-2.)  In its 88

---

[5]    The Court reviews its previous Order in Eby I only for the purpose of determining the judicial act taken and the subject matter of the litigation and issues decided.  See Young,  59 F.3d at 1166 n.11; In re Delta Resources, Inc., 54 F.3d at 725; United States v. Jones, 29 F.3d at 1553.

page Findings of Fact and Conclusions of Law, issued March 21, 2005, the Court recounted that Jacobs was retained by JTA to design the Wonderwood Connector - Contract  2, and how JTA and Jacobs spent years planning the project and developing bridge development reports, which addressed design details for the permanent highways and bridges, as well as how the contractor would access the portions of the highways and bridges to be built over water and marshes.  RS&H, as general consultant reviewed the plans and provided the JTA with feedback.  (Eby I, Doc. 167 at 4-5.)  The Court made multiple findings concerning JTA and Jacobs' pre-bid planning and drawings of the temporary access structures.  (Eby I,  Doc. 167 at 6-12.)  Framing the issue, the Court stated: "At the heart of this case . . . was JTA's inclusion of the drawings [of temporary structures prepared for environmental permitting agencies] in the plans available to bidders without an indication that they were included, not as a temporary access structure design, but only to reflect the area or 'footprint' and type of temporary access structure that had been permitted."  (Eby I, Doc. 167 at 12.)

The Court then made extensive findings concerning the bidding of the Wonderwood 2 project, the documents made available to bidders, Eby's bid, and the bidding results.  (Eby I, Doc. 167 at 12-39.)  Documents considered included Special Provision 103 , entitled Temporary Work Structures", prepared by Mr. Finch,  which addressed the "Temporary Structure" bid item.  (Eby I, Doc. 167 at 13-14.)  Mr. Finch

also conducted a pre-bid meeting on January 25, 2001, to answer any questions prospective bidders may have had.  (<u>Id</u>. at 21-23.)  The bid documents contained numerous numbered plan sheets with drawings and notes, including drawings prepared by Jacobs as part of its effort to obtain environmental permitting during the planning phase.  (<u>Eby I</u>, Doc. 167 at 15.)  The Court stated that "[a] dispute throughout the case has been whether special provision 103 is ambiguous," (<u>Eby I</u>, Doc. 167 at 14), and whether the plan sheets pertaining to the temporary structures were a design specification according the contractor little discretion, or performance specifications which gave the contractor more leeway.  (<u>Eby I</u>, Doc. 167 at 14, 17.)

The Court then reviewed the April 2001 contract documents between JTA and Eby, (<u>Eby I</u>, Doc. 167 at 40–44); the soft soil and Pablo Creek approach problems encountered by Eby in constructing the temporary access structures, (<u>id</u>. at 47-56); and JTA's, Jacobs', Mr. Finch's, RS&H's and RSHCS's response to the problems encountered by Eby.  (<u>Eby I</u>, Doc. 167 at 51-53.)

In its Conclusions of Law, the Court considered each of Eby's claims.[6]  As to Eby's "differing site conditions" claim, (Count I), the Court concluded that it was not cognizable as a separate claim from Eby's superior knowledge and constructability claims in that the soft soil conditions were not latent or unusual for the area involved.

---

[6]     The Court followed Eby's lead and consolidated the independent breach of contract claim (Count II) into Eby's other claims against the JTA.  (<u>Eby I</u>, Doc. 167 at 66.)

(Eby I, Doc. 167 at 69.)

The Court framed Eby's "constructability" claim (Count IV) as a claim that JTA "breached an implied warranty of constructability by providing in the plan sheets a design for dirt haul roads and fingers that could not be constructed as shown." (Eby I, Doc. 167 at 69-70.)   The Court observed that Eby subsequently combined its "constructability" and its "superior knowledge" claims into one asserting that "JTA breached an implied duty to not give bidders information that will mislead them by providing in the plan sheets a design for dirt haul roads and fingers that could not be constructed as shown" and by failing to disclose soil settlement that another contractor had encountered while constructing another segment of the Wonderwood Connector. (Eby I, Doc. 167 at 70.)  In summary, the Court said:

> The gist of Eby's argument is this: JTA misled bidders by giving them plan sheets that depicted dirt haul roads and fingers and indicated specific amounts of component materials without depicting or indicating necessary soil reinforcement or modification measures.  This led Eby to believe that it could construct the dirt haul roads and fingers exactly as depicted without any soil reinforcement or modification.   JTA compounded the confusion by not indicating on the plan sheets that they were to be used solely to understand the type of temporary access structures and footprint for which environmental permits had been obtained; by not stating in the "scope of work" subsection of special provision 103 that the contractor was responsible for the design of temporary access structures; by not disclosing settlement relating to Wonderwood 2A; and by implying in its pre-bid response to bidders' questions that there would be little or no settlement.  (Eby I, Doc. 167 at 76-77.)

11

The Court concluded that Eby failed to make any showing that it "relied on the plan sheets or any other alleged misrepresentations by the time it submitted its bid, or that such reliance would have been reasonable." (Eby I, Doc. 167 at 77.)  "Having failed to prove reliance, or that reliance was reasonable, Eby cannot recover under its constructability or superior knowledge claims." (Eby I, Doc. 167 at 86.)

Final Judgment was entered in favor of JTA and against Eby on March 30, 2005, on all claims. (Eby I, Doc. 168.)

### 3.    Eleventh Circuit Court of Appeals ("Eby I")

Eby appealed the Final Judgment to the Eleventh Circuit Court of Appeals. (Eby I, Doc. 169.)  On April 26, 2006, the Eleventh Circuit affirmed this Court's Judgment, as being supported by its Findings of Fact and Conclusions of Law. Martin A. Eby Constr. Co. v. Jacksonville Transportation Authority, No. 05-12136, 2006 WL 1117952 (11th Cir. 2006).  The Eleventh Circuit recounted the information available to contractors during the bidding process, and characterized Eby's claim as contending that "JTA misled bidders into believing that the construction site could be accessed using temporary roads as reflected in the plan sheets of the contract documents, and that Eby formulated its bid based on JTA's plan sheets regarding temporary access structures." Martin A. Eby Constr. Co., 2006 WL 1117952, at *2. The appellate court affirmed this Court's factual determination that Eby failed to

demonstrate reasonable reliance on the contract documents, including the plans sheets.  Id. at *4.

### C.  Martin K. Eby Construction Co., Inc. v. Jacksonville Transportation Authority, Case No. 3:04-cv-1234-J-32MCR  ("Eby II")

Eby filed a second lawsuit  - the so-called "Main Span" claim - in this Court on November 24, 2004.  (Eby II, Doc. 3.)   That claim arises out of an alleged design error which resulted in the discovery, as the project was nearing completion, that insufficient clearance existed between the underside of the main span of the Intracoastal Waterway bridge and the water level of the Intracoastal Waterway.  (Eby II, Doc. 3, ¶ 8.)[7]  As a result, Eby was required to "stop work" and incurred additional costs totaling $3,453,007.91 (prior to crediting the $1 million advance by the JTA). (Eby II, Doc. 3, ¶¶ 9, 11.)   Eby brought two claims against the JTA in Eby II: (1) breach of contract, alleging JTA failed to provide suitable and constructable design for the Main Span, failed to enter into a supplemental agreement, and failed to pay for extra work or to extend the contract time (Count I) (Eby II, Doc. 3, ¶¶15-18); and (2) "constructability" for allegedly breaching an implied warranty of suitability and accuracy of design in its plans and specifications (Count II).  (Id. ¶¶19-22.)

---

[7]     Eby specifically distinguished the "main span" claim from the claims brought in Eby I, stating in its complaint that "[i]n a related action, [Eby I], Eby is seeking compensation for its soft soil claim and its Pablo Creek Crossing claim," while Eby II involves a third claim arising from the design of the Main Span.  (Eby II, Doc. 3, ¶ 7.)

The JTA answered Eby's complaint, asserted affirmative defenses, and counterclaimed for liquidated damages for delays in completing the project.  (Eby II, Doc. 18.)

On May 2, 2005, JTA brought a third party complaint against Jacobs and its sureties, which included four claims against Jacobs seeking recovery of damages caused by the alleged design error of the Main Span (Counts II-V).  (Eby II, Doc. 22-1, ¶¶34-61.)  JTA seeks recovery from the sureties of liquidated damages for delays, and attorneys' fees and costs (Count I).  (Eby II, Doc. 22-1, ¶¶18-33.)  On June 17, 2005, Eby filed a "First Amended Third-Party Complaint" against Jacobs, seeking recovery from Jacobs for any damages Eby is found to be liable to pay JTA, and other losses.  (Eby II, Doc. 30.)

Because of "on-again, off-again" settlement negotiations, Eby II is in a relatively early stage of litigation.

### D.    Martin K. Eby Construction Co., Inc. v. Jacobs Civil, Inc. et. al, 3:05-cv-394-J-32TEM ("Eby III")

On May 3, 2005, just one month after judgment was entered in favor of JTA against Eby in Eby I, (Eby I, Docs. 167, 168),  Eby filed the instant lawsuit against JTA's Wonderwood 2 Project engineer and consultants, Jacobs, RS&H, and RSHCS.  (Eby III, Doc. 1).  Relevant to the Court's consideration of the motions before it are the

14

allegations in Eby's First Amended Complaint, filed on July 7, 2005.[8]  (Doc. 16.)

## 1.   __Count I - Negligence Against Jacobs__

In Count I of its amended complaint, Eby alleges that JTA and Jacobs entered into a contract on May 24, 1994, pursuant to which Jacobs was to provide JTA with professional and technical services in connection with the Wonderwood 2 Project. Eby alleges that Jacobs, as a professional engineer, and as Engineer of Record, was required to adhere to the standard of care applicable to professional engineers performing like services in the state, as well as various statutory and regulatory obligations imposed on professional engineers.  (<u>Eby III</u>, Doc. 16, ¶ 13.)  Eby further alleges that

> At the time it entered the contract [with JTA], Jacobs was aware that its engineering services and documents would eventually be distributed to bidders, such as Eby, with the intent that the bidders would rely upon those engineering services and documents for the purpose of submitting a low bid for the performance of the work for JTA.  (<u>Eby III</u>, Doc. 16, ¶ 13.)

Eby alleges that Jacobs failed to exercise reasonable care and competence in its performance of pre-bid conceptual or preliminary designs, drawings, constructability review, estimate of construction costs and disclosure of information

---

[8]     An amended complaint supercedes the original complaint, and the only issues before the Court are the ones raised in the text of the amended document. <u>Fritz v. Standard Sec. Life Ins. Co.</u>, 676 F.2d 1356, 1358 (11th Cir. 1982); <u>Smith v. Polk County, Fla.</u>, No. 8:05-cv-873-T-30MSS, 2005 WL 2129189, at * 1 (M.D. Fla. 2005).

that could affect bidders' pricing work.  (<u>Eby III</u>, Doc. 16, ¶ 14.)[9]  Eby alleges that it

_____

[9]      Specifically, Eby alleges in Count I that Jacobs breached its duty of care as follows:

> (a)    failure to comply with the appropriate regulations that require conceptual or preliminary designs to be appropriately labeled;
>
> (b)    failure to note in accordance with regulatory requirements if stamped and sealed drawings containing designs are not complete and correct, and are not to be relied upon and are provided only for information;
>
> (c)    failure to depict structures that were constructible;
>
> (d)    failure to depict on permit drawings structures that were constructible;
>
> (e)    failure to perform an adequate constructability review;
>
> (f)    failure to prepare an adequate estimate of construction costs;
>
> (g)    failure to comply with Florida Department of Transportation recommendations;
>
> (h)    depicting sheet pile structures (that require sheet pile with the largest section modules in the world and commercially unavailable) at Pablo Creek that conflicted with the bridge piers;
>
> (i)    failure to disclose all the information that could affect pricing in the work by a bidder;
>
> (j)    impermissibly delegating design responsibility without clearly stating that Jacobs, as Engineer of

16

relied upon the services and documents provided and prepared by Jacobs in developing and evaluating its low bid submitted to the JTA for the Wonderwood 2 Project, and that this reliance proximately caused damages to Eby.  (Eby III, Doc. 16, ¶¶ 17, 18.)

### 2.    Count II - Negligent Misrepresentation Against Jacobs

Reiterating its allegation that Jacobs and JTA entered into a design contract, and of Jacobs' standard of care and duty, including the allegation that Jacobs was aware its engineering services and documents would be distributed to and relied upon bidders on the Wonderwood 2 Project, (compare Doc. 16, ¶ 13 to ¶ 22), Eby alleges that Jacobs "made affirmative representations that were false" in its pre-bid depiction of conceptual or preliminary designs, drawings, final design, and preparation of construction cost estimates.  (Eby III, Doc. 16, ¶ 23.)[10]  As in Count I, Eby alleges in

―――――――――――

Record, did not intend to be responsible for certain elements of the design; and

(k)    altering a Florida Department of Transportation specification without alerting bidders.  (Eby III, Doc. 16, ¶ 14(a)-(k).)

[10]    Eby's specific allegations in Count II as to Jacobs' alleged misrepresentations are as follows:

(a)    depicting conceptual or preliminary designs, in violation of the appropriate regulations, without labeling the designs as conceptual or preliminary;

17

(b)     depicting designs that are stamped and sealed, and affirming therefore that the designs are complete and correct, when the intent was that these designs were not to be relied upon or were merely provided only for information;

(c)     depicting structures that were not constructible;

(d)     depicting structures on permit drawings that were not constructible;

(e)     depicting structures upon which constructability reviews had not been performed;

(f)     preparing estimates of construction costs that were grossly misleading;

(g)     depicting designs that were not prepared in accordance with the recommendations of the Florida Department of Transportation;

(h)     depicting sheet pile structures (that required sheet pile with the largest section modulus in the world and commercially unavailable) at Pablo Creek that conflicted with the bridges piers;

(i)     depicting structures without disclosing all the information that could affect the pricing of the work by a bidder;

(j)     affirmatively depicting designs stamped and sealed when it was the intent to impermissibly delegate design responsibility from the Engineer of Record to the bidder, and to make the bidder responsible for certain elements of the design; and

(k)     affirmatively representing a specification as a Florida Department of Transportation specification

18

Count II that it relied upon the services and documents provided and prepared by Jacobs in developing and evaluating its low bid submitted to the JTA for the Wonderwood 2 Project, and that this reliance proximately caused damages to Eby. (Eby III, Doc. 16, ¶¶ 26, 27.)

### 3. Count III - Negligence Against RS&H

In its claim against JTA's general consultant RS&H, Eby alleges that JTA and RS&H entered into a General Engineering Consultant Agreement dated October 28, 1999, and that pursuant to that agreement, RS&H was required to provide professional engineering and technical services to JTA in connection with the Wonderwood 2 Project, including plan and constructability review; preparation of bid documents; preparation of an independent engineer's cost estimate; responding to prospective bidders' questions; and assisting with shop drawing reviews and contractor questions during construction of the project. (Eby III, Doc. 16, ¶ 31.) As with Jacobs, Eby alleges that RS&H was aware that its engineering services and documents would be relied upon by bidders in formulating their bids, and that RS&H had a duty to perform its services in accordance with the applicable standard of care. (Id. ¶ 32.)

Mirroring its allegations against Jacobs, Eby alleges that RS&H "failed to

---

without alerting bidders that it had been altered.
(Eby III, Doc. 16, ¶ 23(a)-(k).)

exercise reasonable care and competence" in its issuing of pre-bid conceptual or preliminary designs, engineering documents, permit documents, and drawings, and failed to perform an adequate constructability review and estimate of construction costs. (<u>Eby III</u>, Doc. 16, ¶ 33.)[11]  Also as with Counts I and II, Eby alleges that it relied

---

[11]     Eby specifically alleges in Count III that RS&H failed to exercise reasonable care by:

> (a)     issuing engineering documents that filed to comply with the appropriate regulations that require conceptual or preliminary designs to be appropriately labeled;

> (b)     issuing engineering documents that failed to note in accordance with regulatory requirements if stamped and sealed drawings containing designs are not complete and correct, and are not to be relied upon and are provided only for information;

> (c)     issuing engineering documents that failed to depict structures that were constructible;

> (d)     issuing permit documents that failed to depict structures that were constructible;

> (e)     failing to perform an adequate constructability review;

> (f)     failing to prepare an adequate estimate of construction costs;

> (g)     issuing engineering documents that failed to comply with Florida Department of Transportation recommendations;

> (h)     issuing engineering documents that depicted sheet

20

upon the services of and documents provided and prepared by RS&H in developing its low bid on the Wonderwood 2 project, and that RS&H's breach of its duties proximately caused damages to Eby.  (Eby III, Doc. 16, ¶¶ 36, 37.)

### 4. Count IV - Negligent Misrepresentation Against RS&H

In Count IV against RS&H, Eby repeats its allegations concerning the contract between JTA and RS&H, and that RS&H was aware that "the engineering services and documents it approved and assembled would eventually be distributed to bidders, such as Eby with the intent that the bidders would rely upon those engineering services and documents for the purpose of submitting a low bid" for the Wonderwood 2 Project.  (Eby III, Doc. 16, ¶¶ 41, 42.)  Eby alleges that RS&H failed

---

pile structures (that required sheet pile with the largest section modulus in the world and commercially unavailable) at Pablo Creek that conflicted with the bridge piers;

(i) issuing engineering documents that depict structures but that do not contain all the information that affects the pricing of the work by a bidder;

(j) issuing engineering documents that impermissibly delegated design responsibility without clearly stating that Jacobs, as Engineer of Record, did not intend to be responsible for certain elements of the design; and

(k) issuing specifications without indicating the alteration of a specification from the Florida Department of Transportation.  (Eby III, Doc. 16, ¶ 33(a)-(k).)

21

to exercise reasonable care and competence, and "made affirmative representations that were false" in its pre-bid issuance of engineering and permit documents depicting conceptual or preliminary designs, final designs, structures, and preparation of construction cost estimates and construction documents.  (Eby III, Doc. 16, ¶ 43.)[12]

––––––––––––––––––––

[12]    Eby's specific Count IV allegations of misrepresentation by RS&H are as follows:

> (a)    issuing engineering documents that depicted conceptual or preliminary designs, in violation of the appropriate regulations, without labeling the designs as conceptual or preliminary;
>
> (b)    issuing engineering documents that depicted designs that are stamped and sealed, and affirming therefore that the designs are complete and correct, when the intent was that these designs were not to be relied upon or were merely provided only for information;
>
> (c)    issuing engineering documents that depicted structures that were not constructible;
>
> (d)    issuing permit documents that depicted structures that were not constructible;
>
> (e)    issuing engineering documents that depicted structures upon which constructability reviews had not been performed;
>
> (f)    preparing estimates of construction costs that were grossly misleading;
>
> (g)    issuing engineering documents that depicted designs that were not prepared in accordance with the recommendations of the Florida Department of

Eby alleges that it relied upon the services and documents provided and prepared by RS&H, and that RS&H's alleged breach of its duties as set forth, ie. alleged negligent misrepresentations, proximately caused Eby damages because of this reliance.  (<u>Eby III</u>, Doc. 16, ¶¶ 46, 47.)

     **5.**    <u>**Count V - Negligence and Indemnification Against RSHCS**</u>

In Count V, Eby alleges that RSHCS entered into a subconsultant agreement

_____

         Transportation;

(h)    issuing engineering documents that depicted sheet pile structures (that required sheet pile with the largest section modulus in the world and commercially unavailable) at Pablo Creek that conflicted with the bridges piers;

(i)    issuing engineering documents that depict structures but that do not contain all the information that affects the pricing of the work by a bidder;

(j)    issuing engineering documents that affirmatively depicted designs stamped and sealed when it was the intent to impermissibly delegate design responsibility from the Engineer of Record to the bidder, and to make the bidder responsible for certain elements of the design;

(k)    issuing specifications without indicating the alteration of a specification from the Florida Department of Transportation; and

(l)    issuing construction documents which listed the order of priority of the documents contrary to JTA's intent.  (<u>Eby III</u>, Doc. 16, ¶ 43(a)-(l).)

with RS&H on October 28, 1999 in which RSHCS "assumed all professional engineering and technical services which RS&H agreed to provide" in connection with the Wonderwood 2 Project, and also assumed duties in connection with administration of the JTA/Eby contract. (Eby III, Doc. 16, ¶¶ 51, 53.) Eby alleges that "RSHCS knew that entities, such as Eby, who submitted the low bid and were awarded the contract for construction of the Project, would rely upon its services." (Id., ¶ 54.) Eby alleges that RSHCS failed to exercise reasonable care by failing to ensure that engineering decisions were made by qualified persons, failing to investigate site conditions, failing to make timely or fair decisions on contractor claims, failing to advise of errors, and failing to recommend additional time or payments for Eby.[13] Eby also contends that RSHCS is liable to the extent that RS&H

---

[13]    Eby's specific Count V allegations that RSHCS failed to exercise reasonable care are as follows:

> (a)    failure to have engineering decisions made by qualified individuals or under the supervision of qualified individuals;
>
> (b)    permitting unqualified and unlicensed individuals to make professional engineering decisions;
>
> (c)    failure to exercise independent engineering judgment with regard to entitlement of claims related to temporary structures;
>
> (d)    allowing unlicensed and unqualified individuals to "ghost write" its letters and decisions;

is liable, alleging: "By reason of assumption of all duties and responsibilities undertaken by RS&H in connection with the Project, RSHCS is liable for negligence or negligent misrepresentation on the part of RS&H." (Id., ¶ 56.)  As with Eby's other claims, Eby alleges that its reliance upon the services and documents provided by RSHCS and upon RSHCS to comply with its duties as a professional engineer, proximately caused Eby damages.  (Eby III, Doc. 16, ¶ 59.)

Eby also alleges that based upon RSHCS's contract with RS&H, RSHCS is required "to indemnify Eby" for all costs, losses and expenses, including attorneys' fees and costs, citing a clause in the RS&H/RSHCS contract that provides that RSHCS "'agrees . . . to defend, indemnify, and hold . . .  the Contractor [Eby]  . . . harmless from all suits, actions, claims, demands, judgments, and liabilities

---

(e)   failing to investigate potential differing site conditions;

(f)   failing to make timely decisions on claims submitted in connection with the Project;

(g)   failing to advise Eby or JTA of erroneous quantities;

(h)   failing to make timely decisions on claims in a fair, independent and good faith manner;

(i)   failing to recommend or approve additional time or additional payments to Eby for changes, delays, added work or impacts to the work.  (Eby III, Doc. 16, ¶ 55(a)-(I).)

25

howsoever arising, including property damages and bodily injury or death . . . arising from or in connection with any negligent act, omission, or breach of contract of or by the Sub-consultant . . ..'" (Eby III, Doc. 16, ¶¶ 52, 61.)(emphasis added).

## III. Discussion

Though the Defendants raise several arguments as a basis for dismissal of Eby's amended complaint, the Court focuses upon those asserting that Eby's claims are barred by the doctrines of *res judicata* and collateral estoppel based upon the prior litigation and final judgment in Eby I.[14]

Eby contends that the claims asserted in Eby III "while arising out of the same construction Project, are separate and distinct from the allegations and claims involved in the lawsuit against the JTA," (Eby III Doc. 26 at 2; Doc. 27 at 2), because Eby's claims against the JTA "were contract claims arising out of the construction contract for the Project," while its claims against Jacobs, Finch, RS&H, and RSHCS are based on an alleged breach of professional duties, and with respect to RSHCS, contractual indemnity. (Eby III, Doc. 26 at 2-3; Doc. 27 at 2-3.)

---

[14]   Jacobs and Finch argue that Eby's amended complaint should be dismissed on the basis of *res judicata* and collateral estoppel, among other reasons.  The RS&H defendants argue only collateral estoppel, and do not assert *res judicata* as a basis for dismissal of the complaint.

**A.**   *Res Judicata*

**1.**   **Applicable Law**

Under *res judicata*, which is also known as "claim preclusion," a final judgment on the merits bars the parties to a prior action from re-litigating a cause of action that was or could have been raised in that action.   Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1187 (11th Cir. 2003); In re Piper Aircraft Corp., 244 F.3d 1289, 1296 (11th Cir. 2001).[15]   *Res judicata* acts as a bar "'not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact.'" Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1356-57 (11th Cir. 1998)(citation omitted).  "[F]or *res judicata* purposes, claims that 'could have been brought' are claims in existence at the time the original complaint is filed or claims actually asserted . . . in the earlier action . . .  The underlying core of facts must be the same in both proceedings." Schafler, 139 Fed. Appx. at 150.

A party seeking to invoke *res judicata* must satisfy four elements: (1) the prior decision must have been rendered by a court of competent jurisdiction; (2) there must have been a final judgment on the merits; (3) both cases must involve the same parties or their privies; and (4) both cases must involve the same causes of action.

---

[15]      "[F]ederal preclusion principles apply to prior federal decisions, whether previously decided in diversity or federal question jurisdiction." CSX Transp., Inc. v. Brotherhood of Maintenance of Way Employees, 327 F.3d 1309, 1316 (11th Cir. 2003); see also Schafler, 139 Fed. Appx. at 150.

See Davila, 326 F.3d at 1187; Piper, 244 F.3d at 1296.  "The court next determines whether the claim in the new suit was or could have been raised in the prior action; if the answer is yes, res judicata applies."  Piper, 244 F.3d at 1296.

The parties here do not dispute the first two elements of res judicata, that is that the prior case under consideration, Eby I,  involved a final judgment on the merits rendered by a court of competent jurisdiction.  Though Eby does not dispute that the defendants meet the "privity" requirement of res judicata, the Court will review the applicable legal standards.

Strict "identity of parties" is not required to satisfy the third element of res judicata.  Rather, the "identity of party" requirement may be "satisfied under federal common law if either the parties on each side of the prior suit are identical to those in the current litigation, or they are in privity with each other.  Federal common law recognizes several ways in which parties may be in privity.  Among these, privity exists where there is 'a non-party whose interests were represented adequately by a party in the original lawsuit.'"  Edwards v. Alabama Dept. of Corrections, 81 F. Supp.2d 1242, 1247 (M.D. Fla. 2000)(quoting Southwest Airlines Co. v. Texas Internat'l Airlines, Inc., 546 F.2d 84, 95 (5th Cir. 1977)).[16]  "'Privity' is a flexible legal term, comprising several different types of relationships and generally applying when

_____

[16]     In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

a person, although not a party, has his interests adequately represented by someone with the same interests who is a party." E.E.O.C. v. Pemco Aeroplex, Inc., 383 F.2d 1280, 1286 (11th Cir. 2004), cert. denied, 126 S.Ct. 42 (2005). "'Privity' describes a relationship between one who is a party of record and a nonparty that is sufficiently close so as a judgment for or against the party should bind or protect the nonparty." Hart v. Yamaha-Parts Distributors, Inc., 787 F.2d 1468, 1472 (11th Cir. 1986).

While a "privity" relationship between the party and the nonparty may be one of several types, applicable here is the privity created "where the nonparty's interests were represented adequately by the party in the original suit." Hart, 787 F.2d at 1473. The "adequate representation" category of privity is described by the Eleventh Circuit as the doctrine of "virtual representation", such that the non-party's interests were so similar to the interests of the party to the prior action that the prior party acted as the non-party's virtual representative. E.E.O.C. v. Pemco Aeroplex, Inc., 383 F.3d at 1286-87. "'Virtual representation' is a term of art . . . defined as applying 'when the respective interests are closely aligned *and* the party to the prior litigation adequately represented those interests.'" E.E.O.C. v. Pemco Aeroplex, Inc., 383 F.3d at 1287 (citation omitted). In determining "virtual representation," the Eleventh Circuit enumerates four factors to be considered in concert, though none of the factors is either necessary or sufficient: whether there was participation in the first litigation; apparent consent to be bound; apparent tactical maneuvering; and close relationships

between the parties and the nonparties.  E.E.O.C. v. Pemco Aeroplex, Inc., 383 F.3d

at 1287.  "Whether a party is a virtual representative of another is a question of fact."

Id.[17]

As to the fourth element of *res judicata*, "claims are part of the same cause of

action for *res judicata* purposes when they arise out of the same transaction or series

of transactions."  Piper, 244 F.3d at 1296-97.

> "In determining whether the causes of action for *res
> judicata* are the same, a court must compare the substance
> of the actions, not their form.  It is now said, in general, that
> if a case arises out of the same nucleus of operative fact,
> or is based upon the same factual predicate, as a former
> action, that the two cases are really the same "claim" or
> "cause of action" for purposes of *res judicata*.

Piper, 244 F.3d at 1297 (citation omitted).  See also Davila, 326 F.3d at 1187;

O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1355 (11th Cir. 2000).  *Res*

---

[17]     Underscoring the evolution of the "privity" element of *res judicata* in this
Circuit, the Eleventh Circuit held in 1990 that "[t]he question of whether sufficient
privity exists to warrant application of *res judicata* is a question of law."  N.A.A.C.P.
v. Hunt, 891 F.2d 1555, 1561 (11th Cir. 1990)(citing Southwest Airlines Co., 546
F.2d at 95 (also citing federal cases)).  The Court in E.E.O.C. v. Pemco Aeroplex,
383 F.3d at 1289 distinguished Hunt by saying that it involved the application of
Alabama's law of preclusion rather than federal preclusion law. However, even
after E.E.O.C. v. Pemco Aeroplex, supra, it is clear that the undisputed facts
supporting a finding of "virtual representation" privity may be so clear and
undisputed on the face of a complaint that the district court may determine as a
matter of law, that privity exists and dismiss the complaint.  See Armstrong v. City
of Conyers, No. 04-11355, 2005 WL 1415993, at * 1 (11th Cir. 2005)(affirming
dismissal of complaint on *res judicata* grounds, holding that parties in both cases
were in privity with each other).

*judicata* precludes claims that "'could have been brought'" in the earlier litigation. Piper, 244 F.3d at 1298.  Thus, "'*[r]es judicata* acts as a bar "not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact."  A court, therefore, must examine the factual issues that must be resolved in the second suit and compare them with the issues explored in the first case.'" Piper, 244 F.3d at 1298-99 (citations omitted). For *res judicata* purposes, claims that "could have been brought" are "claims in existence at the time the original complaint is filed or claims actually asserted by supplemental pleadings or otherwise in the earlier action.'" Piper, 244 F.3d at 1299 (citation omitted; emphasis omitted). *Res judicata* will also bar a claim if "the facts underlying the claim were actually raised" in the earlier action.  Piper, 244 F.3d at 1299.[18]

        "The purpose behind the doctrine of *res judicata* is that the 'full and fair opportunity to litigate protects [a party's] adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." Ragsdale v.

_____

[18]        Though no single factor is determinative of "same claim or cause of action" for purposes of *res judicata*, "'the relevance of trial convenience makes it appropriate to ask how far witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first.  If there is a substantial overlap, the second action should ordinarily be precluded.'" Ragsdale v. Rubbermaid, Inc., 193 F.3d 1235, 1239 n.8 (11th Cir. 1999)(citing Restatement (Second) of Judgments § 24(2) cmt. b (1980)).

Rubbermaid, Inc., 193 F.3d 1235, 1238 (11th Cir. 1999)(citing Montana v. U.S., 440 U.S. 153-54 (1979)).

The burden is on the party asserting *res judicata* to show that the later-filed suit is barred.  See Piper, 244 F.3d at 1296.  A complaint may be dismissed with prejudice if the elements of  *res judicata* are apparent on its face.  See Davila, 326 F.3d at 1186-87; Armstrong, 2005 WL 1415993, at * 1; Jang v. United Technologies Corp., 206 F.3d 1147 (11th Cir. 2000); Schafler, 139 Fed. Appx. 147; Edwards, 81 F. Supp.2d at 1247.

### 2. Eby's Claims Are Barred By *Res Judicata*

Eby attempts to avoid the *res judicata* effect of the Court's judgment in Eby I by re-casting and re-labeling its claims and rotating defendants.  See Kizzire v. Baptist Health System, Inc. 441 F.3d 1306, 1309 (11th Cir. 2006); Schafler, 139 Fed. Appx. at 151.  But, comparing the substance of the actions in Eby I and Eby III, and the relationship of the defendants in the two actions, it is clear that Eby's claims in this proceedings are barred *res judicata*.

Eby argues that though there are "'similarities'" between the two actions,  the claims here are not the same and "are not based upon the same factual predicate" as those asserted in Eby I against the JTA because the parties in Eby I did not litigate the consultants' and engineer's professional duty owed to Eby.  (Eby III, Doc. 26 at 13-14.)

Looking first to the substance of the two actions, both involve the pre-bid plans, specifications, drawings and representations made to prospective bidders, including Eby, concerning the temporary access structures in the Wonderwood 2 Project.  The Court, in <u>Eby I</u>, made multiple findings about JTA's and Jacobs' pre-bid planning and drawings, and framed the issue as being JTA's inclusion of drawings in plans available to bidders.  (<u>Eby I</u>, Doc. 167 at 6-12.)  These pre-bid plans and drawings were prepared by Jacobs, defendant in this action.  (<u>See</u> <u>Eby I</u>, Doc. 167 at 8, 9, 15.)  The "constructability" issue determined in <u>Eby I</u> was whether JTA "breached an implied warranty of constructability by providing in the plan sheets a design for dirt haul roads and fingers that could not be constructed as shown." (<u>Eby I</u>, Doc. 167 at 69-70.)

Eby's claims against the Jacobs here likewise are based upon pre-bid plans, drawings and specifications, and Eby's alleged reliance thereon.  (<u>Eby III</u>, Doc. 16, ¶¶ 13, 14, 17, 18, 22, 26, 27.)  Indeed, the subject matter of the two cases is so intertwined that  Eby even attempted to argue in <u>Eby I</u> that Jacobs failed to adhere to state guidelines for engineers by not indicating on plan sheets that its drawings were preliminary or conceptual, (<u>Eby I</u>, Doc. 167 at 18 n. 17), the identical claim asserted in their claims against Jacobs brought here.  (<u>Eby III</u>, Doc. 16, ¶¶ 14(a) and (b), 23(a) and (b).)

Eby's claims against RS&H are similarly identical to those litigated to

conclusion in <u>Eby I</u>, also being based upon RS&H's participation in pre-bid plans, specifications and drawings, and Eby's alleged reliance in formulating its low bid. (<u>See</u> <u>Eby III</u>, Doc. 16, ¶¶ 31, 32, 33, 36, 37.)  Eby alleges here that RS&H is liable for negligence and negligent misrepresentation based upon its oversight of Jacobs. RS&H's pre-bid involvement with Project plans and specifications was also considered in <u>Eby 1</u>.  (<u>Eby I</u>, Doc. 167 at 5, 38.)

Though Eby's amended complaint supercedes its original complaint in this action, the Court observes that Eby amended its initial complaint, purging it of the allegation that the "claims that are the subject of this litigation arise from the temporary access structures."  (<u>Eby III</u>, Doc. 1, ¶ 13).  Eliminated were the initial complaint's references to "temporary access structures" ( <u>Eby III</u>, Doc. 1, ¶¶ 15, 17-22, 25, 27, 29-30, 32-33, 35, 37-43, 45-46, 49-50, 52-53, 60-63); Eby's "soft soil" claim (<u>id</u>., ¶¶ 54-58), and its Pablo Creek crossing claim, (<u>id</u>., ¶¶ 60-65)).  Eby replaced these specific references with more generic and vague allegations, in an apparent attempt to avoid the consequences of the doctrines of *res judicata* and collateral estoppel, which had been raised by Jacobs' motion to dismiss.  (<u>Eby III</u>, Doc. 11.).  <u>See generally</u> <u>Jaffree v. Wallace</u>, 837 F.2d 1461, 1463, 1466 (11th Cir. 1988)(affirming district court holding that plaintiffs were estopped to amend a second action raising the same issues which they had a prior opportunity to litigate in an effort to surmount an otherwise fatal *res judicata* bar).  Counsel for Eby conceded at oral

argument that <u>Eby III</u> is "principally about temporary structures" and that Eby is seeking principally the same damages as it did in <u>Eby I</u>, but argued that Eby brings different causes of action here, and that the Court's analysis on motion to dismiss is limited to the face of the amended complaint.

The allegations of Eby's amended complaint, however, are sufficient to discern that this case is about conceptual or preliminary designs, drawings and specifications, depictions of constructability, cost estimates, the Pablo Creek sheet pile structures, subsurface and site conditions, estimating approaches, pre-bid questions and answers, and Eby's reliance thereon in formulating its low bid. (<u>Eby III</u>, Doc. 16, ¶¶ 13, 14(a)-(k), 17, 18, 22, 23(a)–(k), 26, 27, 31, 32, 33(a)-(k), 36, 37, 41, 42, 43(a)-(l), 46, 47, 54, 55(e).) "Temporary structures" is mentioned twice in the amended complaint, in connection RS&H and RSHCS' duties. (<u>Eby III</u>, Doc. 16, ¶¶ 11, 55(c).)

Now, however, instead of claiming that JTA misled bidders by giving them plan sheets with inaccurate drawings and specifications for temporary access structures, Eby here alleges that Jacobs and RS&H breached their professional duty and misled bidders by "issuing" and "depicting" these same allegedly inaccurate plan sheets. Without question, Eby's claims asserted in the instant action existed and arise out of the same operative nucleus of fact, and could have been raised in <u>Eby I</u>. Proofs required in <u>Eby III</u> would overlap, if not be identical to, those already presented at trial in <u>Eby I</u>. For instance, Mr. Finch, named as a defendant in the instant case, testified

at the trial in Eby I about Jacobs' development of drawings for the Wonderwood 2 Project temporary structures.   Mr. Finch also testified he prepared the Special Provision in the temporary structure bid item, assisted with preparation of a project cost estimate, and conducted a pre-bid question and answer session with prospective bidders, all complained of here.  Furthermore, RS&H employees also testified at the Eby I trial.  (See  Eby I, Doc. 167 at 9-10, 13, 18, 21, 38; Eby I, Docs. 156, 160; see generally Eby I, Doc. 76-1 at 6-10 (Joint Pretrial Stipulation witness list).)

That Eby did not name Jacobs, Finch, RS&H and RSHCS as defendants in Eby I is not determinative. See Hart, 787 F.2d at 1471.  JTA and the defendants in this case stood shoulder to shoulder in their relationship  and dealings with Eby. Affirmatively alleging in this case the existence of these intertwining contracts between JTA and Jacobs, RS&H, and RSHCS, (Eby III, Doc. 16, ¶¶ 9, 10, 13, 22, 31, 41), Eby cannot be heard to say that Jacobs' and RS&H's interests as to the pre-bid Project plans, specifications and drawings, and Eby's reliance, was not adequately represented by JTA in the first action.  Indeed, by asserting the preclusionary effects of the Eby I judgment, Jacobs, RS&H and RSHCS, the nonparties in the first action, embrace JTA's "virtual representation" and close relationship with them vis a vis the issues raised by Eby's claims.  Clearly, the respective defendants' interests were closely aligned with JTA's, if not identical.

A reading of Eby's amended complaint in the instant case shows that all of its

claims against these defendants were in existence in November 2003, the date of its amended complaint in <u>Eby I</u>, and could have been raised in <u>Eby I</u>.  The two lawsuits involve the same nucleus of operative fact; Eby's current claims are merely different legal theories, brought against JTA's privies.  Looking to the factual issues to be resolved here in <u>Eby III</u>, and comparing them with the issues explored in <u>Eby I</u>, <u>see</u> <u>Ragsdale</u>, 193 F.3d at 1239, Eby's claims in this case are based on the same factual predicate and arise out of the same nucleus of operative facts as did Eby's claims brought against the JTA in <u>Eby I</u>, and are thus barred, as a matter of law, by the doctrine of *res judicata*.

**B.  Collateral Estoppel**

**1.  Applicable Law**

"While *res judicata* bars relitigation of claims, collateral estoppel precludes relitigation of an issue that has already been litigated and resolved in a prior proceeding." <u>Pleming</u>, 142 F.3d at 1359. "'Once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue . . .'" <u>Callasso v. Morton & Co.</u>, 324 F. Supp.2d 1320, 1324 (S.D. Fla. 2004)(quoting <u>Allen v. McCurry</u> 449 U.S. 90, 94 (1980)). "Collateral estoppel, unlike *res judicata*, is not limited to parties and their privies.  A defendant who was not a party to the original action may invoke collateral estoppel against the plaintiff." <u>Hart</u>, 787 F.2d at 1473. "Defensive collateral estoppel is an attempt to prevent a plaintiff from

37

relitigating an issue which the plaintiff has previously litigated unsuccessfully against another defendant." Charles J. Arndt, Inc. v. City of Birmingham, 748 F.2d 1486, 1494 n. 9  (11th Cir. 1984)(citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n. 4 (1979)).

The prerequisites for the application of collateral estoppel are: (1) the issue at stake must be identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior proceeding; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action, and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding. Pleming, 142 F.3d at 1359;  Precision Air Parts, Inc. v. Avco Corp., 736 F.2d 1499, 1501 (11th Cir. 1984).

As with res judicata, a complaint may be dismissed under the doctrine of collateral estoppel. See Callasso, 324 F.Supp.2d at 1326; Jones v. Law Firm of Hill and Ponton, 141 F. Supp.2d 1349 (M.D. Fla. 2001).  Collateral estoppel provides an alternative basis for dismissal of Eby's amended complaint.

## 2.   Eby's Claims Are Barred By Collateral Estoppel

Eby squarely, in the first four counts of its amended complaint, bases its claims of negligence and negligent misrepresentation upon its reliance on pre-bid documents, plans, drawings, specifications, and answers to contractor questions

concerning the constructability of the temporary access structures.  This issue of reliance was decided and adjudicated on the merits in <u>Eby I</u> in which the Court determined: "What is lacking from Eby's case . . . is a showing that Eby relied on the plan sheets or any other alleged misrepresentations by the time it submitted its bid, or that such reliance would have been reasonable."  (<u>Eby I</u>, Doc. 167 at 77.)

Eby argues that the Court, in <u>Eby I</u> did <u>not</u> decide the following "generic issues" it raises in its amended complaint in <u>Eby III</u>: (1) whether the Jacobs and RS&H defendants failed to perform in accordance with the applicable standard of care, proximately causing damage to Eby; (2) whether "defects in the contract documents" that RS&H defendants failed to discover caused damages to Eby; (3) whether Eby relied on Jacobs and RS&H defendants' professional services or alleged misrepresentations and (4) whether RSHCS was required to indemnify Eby "from claims and damages arising out of the Project".  (<u>Eby III</u>, Doc. 26 at 7-8; Doc. 27 at 10-11.)  "Eby does not seek to re-litigate the issue of whether Eby reasonably believed, based on the plans, that it could construct the temporary access structures precisely as drawn."  (<u>Eby III</u>, Doc. 27 at 12.)  Rather, the central issue here, according to Eby, is whether Jacobs, RS&H and RSHCS performed pre-bid planning in accordance with the applicable standards of care, and whether Eby relied upon the work of the engineer and consulting defendants.  (<u>Eby III</u>, Doc. 26 at 10; Doc. 27 at 12.) Eby enumerates the purposes for its reliance, all of which relate to Eby's pre-bid

39

preparation and formulation of its low bid submitted to the JTA, (<u>Eby III</u>, Doc. 26 at 10-11; Doc. 27 at 13), and never, either in its amended complaint or in argument of counsel, specifies any other issues of reliance not litigated in the prior action.

Eby agrees that the Court in <u>Eby I</u> decided the issue of reliance, noting that "[t]he Court [in <u>Eby I</u>] considered the bulk of these claims together, finding proof of Eby's reasonable reliance on plans, specifications and other contract documents provided by JTA to be a common and necessary element for recovery under the primary theories Eby asserted," (<u>Eby III</u>, Doc. 26 at 7; Doc. 27 at 9 (citing <u>Eby I</u>, Doc. at 69, 71), and that the Court in <u>Eby I</u> "determined that '[h]aving failed to prove reliance, or that reliance was reasonable, Eby cannot recover *under its constructability or superior knowledge claims.*'" (<u>Eby III</u>, Doc. 26 at 7; Doc. 27 at 10 (quoting <u>Eby I</u>, Doc. 167 at 86)(emphasis added by Eby).)

Eby attempts to narrow the <u>Eby I</u> reliance issue, arguing that "implicit" in the Court's ruling was the determination that Eby did not rely upon the pre-bid plans, specifications and drawings because Eby "modified the design to incorporate certain bid enhancements," did not follow the temporary access structure plans exactly as shown, and constructed the temporary structures differently.  This, argues Eby, was the  "critical issue determined" in <u>Eby I</u>.  (<u>Eby III</u>, Doc. 26 at 9; Doc. 27 at 11-12 (citing <u>Eby I</u>, Doc. 167 at 82).)

Eby's attempt to circumscribe the reliance issue decided in <u>Eby I</u> is misplaced.

40

The Court in <u>Eby I</u> concluded was that Eby failed to show that it "relied on the plan

sheets or any other alleged misrepresentations by the time it submitted its bid, or that

such reliance would have been reasonable" because "by the time it [Eby] submitted

its bid, Eby knew that the direct haul roads and fingers would require more than what

was reflected on the plan sheets; and that Eby failed to disclose to JTA, or seek

clarification from JTA on, any inconsistency between the plan sheets and the actual

requirements." (<u>Eby I</u>, Doc. 167 at 77.)  Further, the Court concluded that had Eby,

pre-bid, conducted a reasonable site investigation of the patent water and marsh

conditions, reviewed soil boring information, and listened to the pre-bid soft-soil

issues raised by vendors of reinforcement material, Eby would have or should have

known of the difficult site conditions for the temporary access structures, and adjusted

its bid accordingly. (<u>See</u> <u>Eby I</u>, Doc. 167 at 78-83.)[19]

> During the bid process, therefore, Eby was not faced with
> a subtle or hidden defect; it was faced with, and in fact
> accounted for (albeit inadequately), the obvious: that plan
> sheets provided by JTA did not indicate soil reinforcement
> or modification measures but a site investigation, soil
> boring information, and vendor information as a whole
> indicated or should have indicated to a reasonable
> contractor that such measures were necessary to build dirt
> haul roads and fingers that would support construction
> equipment.  Rather than seeking any clarification from JTA,
> however, Eby submitted its bid knowing, as it stated in its
> post-bid review meeting, that "Platform 'soft' ground may

---

[19]     The Court examines the <u>Eby I</u> Order solely for the purpose of determining
the subject matter and the issues decided in <u>Eby I</u>.

cause [the dirt haul roads and fingers] to fail.'" (<u>Eby I</u>, Doc. 167 at 83-84.)

The issue of Eby's reliance on the pre-bid plans, drawings and specifications provided by Jacobs and RS&H by contract through the project owner, JTA, is a critical and necessary element to Eby's proving proximate cause in its negligence claims against Jacobs and RS&H, (Counts I and III) (<u>see</u> <u>Eby III</u>, Doc. 16, ¶¶ 17, 18, 36, 37), as well as Eby's proving negligent misrepresentation (Counts II and IV).  (<u>See</u> <u>Eby III</u>, ¶¶ 26, 27, 46, 47.)  This identical issue, Eby's reliance on those same plans, was critical and necessary to Eby's proving causation in its contract claims against the JTA in <u>Eby I</u>.  Eby had a full and fair opportunity to litigate the issue of reliance in the prior action.

Jacobs, Finch, RS&H and RSHCS are entitled to the benefit of the Court's ruling in <u>Eby I</u>, which has now been affirmed on appeal, and to dismissal of Eby's amended complaint on the basis that Eby's claims against them asserted here are barred by collateral estoppel.  <u>See</u> <u>Stephens v. State Farm & Cas. Co.</u>, 149 Fed. Appx. 908, 910-11 (11th Cir. 2005) (affirming dismissal of complaint on collateral estoppel grounds); <u>Callasso</u>, 324 F.Supp.2d at 1326; <u>Jones</u>, 141 F. Supp.2d at 1359.[20]

---

[20]   Count V of Eby's Complaint asserted against RSHCS, is contingent upon Eby's success on Counts I through IV, and upon the results in <u>Eby I</u>.  Because Eby's other claims have failed, so too does Count V.  First, Eby alleges that pursuant to RSHCS's contract with RS&H, RSHCS assumed all duties and

## **Conclusion**

Eby made the informed tactical decision in <u>Eby I</u> to sue the owner of the Wonderwood 2 project, the JTA, in contract, and, based on the provisions of that contract, litigate its design and constructability claims before the Court.  Eby, for its own reasons, chose not to sue the instant defendants in <u>Eby I</u>.  The parties in <u>Eby I</u> presented evidence in detail pertaining to pre-bid design, specifications and drawings; the administration of the construction contract; and the problems encountered by Eby in constructing temporary access structures.  Eby had a full and fair opportunity to litigate these issues.  One month after losing on its contract claims, Eby brought the same design and constructability claims here against the engineers, designers, and consultants in tort, claiming breach of professional duty.  The doctrines of *res judicata*

───────────────────

responsibilities of RS&H, and is liable for RS&H's alleged negligence and negligent misrepresentations.  (<u>Eby III</u>, Doc. 16, ¶¶ 51, 56; <u>see also</u> Doc. 27 at 14.)  Second, Eby's claim that RSHCS is allegedly liable for damages proximately caused to Eby by RSHCS's administration of Eby's contract with JTA, (<u>see</u> <u>Eby III</u>, Doc. 16, ¶¶ 53, 55, 57, 59), assumes that Eby suffered damages - not of its own making - in connection with the Wonderwood 2 Project, which Eby has not to date established.  Finally, the indemnity provision contained in the RS&H/RSHCS contract, cited by Eby (<u>Eby III</u>, Doc. 16, ¶ 52; <u>see also</u> Doc. 27 at 14 (RSHCS agreed "to indemnify Eby from claims or losses on the Project")) offers Eby no basis for recovery from RSHCS on its face because Eby has nowhere alleged that it has suffered any damages "<u>from</u> suits, actions, claims, demands, judgments and liabilities . . . arising from or in connection with any negligent act, omission, or breach of contract" by RSHCS."  (<u>Id</u>. (emphasis added).)  The indemnity provision does not state, on its face, that RSHCS is obliged to reimburse Eby for Eby's own "losses," as Eby asserts.  (<u>Eby III</u>, Doc. 27 at 14.)  Of course, if later events allow Eby to properly assert this indemnity provision in another context, this ruling does not prevent that.

and collateral estoppel guard against this type of tactical maneuvering, protecting adversaries from the expense and vexation of multiple lawsuits, conserving judicial resources, and minimizing the possibility of inconsistent decisions.

Because Eby can state no cognizable claim against these defendants concerning their pre-bid plans, drawings, and specifications, and their administration of these plans relating to Eby's construction of temporary structures in the Wonderwood 2 Project without running into the preclusive effect of Eby I, it is futile for Eby to attempt to amend its complaint a second time. Dismissal of Eby's First Amended Complaint must be with prejudice. See Davila, 326 F.3d at 1187 n. 2; Jang, 206 F.3d at 1148.

For the foregoing reasons, and upon due consideration, it is hereby **ORDERED:**

1.      Jacobs' and Finch's Motion To Dismiss Eby's Amended Complaint With Prejudice (Doc. 20) is **GRANTED.**

2.      The Motion Of Defendant Reynolds, Smith And Hills, Inc. And Reynolds, Smith And Hills CS, Inc. To Dismiss First Amended Complaint (Doc. 22-1) is **GRANTED.**

3.      The Motion Of Defendants Reynolds, Smith And Hill, Inc. And Reynolds, Smith And Hill, CS, Inc. For Judicial Notice Of Case No. 3:03-cv-41-J-32TEM (Doc. 36) is **GRANTED.**

4.      Martin K. Eby Construction Company's First Amended Complaint (Doc. 16) is **DISMISSED WITH PREJUDICE** as to all claims.

5.      The Clerk is directed to enter Judgment in favor of all defendants and against plaintiff on all claims, and to close this case.  For purposes of appellate review, the Clerk shall create and file an appendix of all judicially noticed documents.

**DONE AND ORDERED** at Jacksonville, Florida, this 6th day of July, 2006.

TIMOTHY J. CORRIGAN
United States District Judge

j.
Copies to:
Counsel of Record